Peter **MARTELLA**

v.

**GREAT ATLANTIC & PACIFIC TEA COMPANY**

and

**Hunt-Wesson Sales Company, Incorporated.**

**Civ. A. No. 33297.**

United States District Court
E. D. Pennsylvania.

March 13, 1969.

Leonard Sagot, Ettinger, Poserina, Silverman, Dubin, Anapol & Sagot, Philadelphia, Pa., for plaintiff.

Jos. Head, Swartz, Campbell & Detweiler, Philadelphia, Pa., for defendants.

OPINION AND ORDER

DAVIS, District Judge.

After drinking two glasses of tomato juice from a can packed by the defendant

---

Hunt-Wesson Sales Company, Inc. and purchased through one of the Great Atlantic & Pacific Tea Company's retail outlets, the plaintiff complained of stomach cramps and vomiting. The family physician was then summoned, who diagnosed the plaintiff's illness as food poisoning. There was ample evidence for the Court as trier-of-fact, to conclude by a preponderance of evidence that there was a causal relationship between the plaintiff's acute food poisoning, and the ingestion of the defendant Hunt-Wesson's tomato juice, and also that the tomato juice was in a contaminated and deleterious state through no fault or negligence on the part of the plaintiff or any of his agents. In this regard, the plaintiff himself testified that the tomato juice had a rather unusual taste; that it was tart and "a little heavy" (N.T. p. 16). This was corroborated in part by the observation of the treating physician. After being summoned to the plaintiff's home, his discussion with the plaintiff's wife caused them to systematically eliminate all other foods which had been ingested by other members of the family without adverse effect. The investigation then centered about a can of recently opened tomato juice from which no one else in the Martella household had partaken. The suspect can was then retrieved from the trash. Upon examination, the treating physician:

> * * * found about one inch from the top of the can a band of corrosion about one and half [sic] inches in heights [sic] all around the circumference of the can in this area. It looked like rust. (D. Ex. 2.)

This was reiterated by the physician's testimony in Court, and corroborated by the plaintiff's spouse, who was also present during the initial examination of the can. This evidence was taken into consideration by the treating physician in diagnosing the plaintiff's attack as acute food poisoning.

Although given ample opportunity to thoroughly analyze the contents of the can (P. Ex. 1), since it was voluntarily relinquished by the plaintiff's spouse to defendant's claim investigator ten days after the plaintiff's attack, no satisfactory evidence was submitted by the defendants to the contrary. Instead the defendants rather strenuously but unconvincingly asserted that only a *visual* examination of the can had been conducted, notwithstanding that first, the can was in the possession of the defendants for about two months; second, that it was sent to the defendant Hunt-Wesson's quality control laboratory in California and finally, one of the defendant's agents had indicated in 1963, one year after the attack, that:

> It [the can] was returned to you in the same condition in which it was received except that some of the material had to be removed by the chemist to make an analysis. (See enclosures to plaintiff's motion under Rule 34, (document 7)).

While the Court does not wish to suggest any impropriety on the part of the defendants or their agents, the three factors recited above are indicative of the existence of an adequate opportunity to have examined the can for the purpose of rebutting or otherwise refuting the observation of Doctor Ferri and Mrs. Martella, and the reasonable conclusions which were derived therefrom.

In this regard, the diagnosis and observation of Doctor Ferri regarding the presence of a deleterious substance in the can, was substantiated by the testimony of Doctor Bernard Witlin, a bacteriologist, who indicated that:

> * * * the substance in the can had to be a contaminant or filth. (N.T. p. 324).

■ Accordingly, I conclude that the attack of acute food poisoning which the plaintiff sustained on March 16, 1962, was proximately caused by the contaminated tomato juice packed under the

label of the defendant Hunt-Wesson, and distributed by the defendant A & P.

The more significant question however, is whether the plaintiff's condition of portal cirrhosis of the liver was causally related to the food poisoning. This problem presented the usual conflict of expert medical testimony.

Briefly, the plaintiff's treating physician concluded that the cirrhosis existed prior to the food poisoning attack, but was in a dormant, or latent state. He further asserted that it is a "proven autopsy fact" that such a condition could remain dormant or latent for the rest of a man's lifetime. However, he added that an infection, trauma or "insult" to the body could manifest or precipitate a cirrhotic condition. The ingestion of the deleterious tomato juice, concluded Doctor Ferri, acted as a triggering insult to the plaintiff's liver, resulting in the manifestation of the cirrhotic condition.

The position of the defendant's principal medical witness was, of course, to the contrary. Doctor W. J. Snape examined the plaintiff eleven months after the incident at issue. Doctor Snape was also afforded the benefit of Doctor Ferri's reports, as well as the records of the Delaware County Memorial Hospital. Essentially, Doctor Snape concluded that the cirrhotic condition was attributable to alcoholism. This was corroborated in part by the plaintiff's own statement given pursuant to the preparation of a medical history when he was admitted to the hospital (N.T. pp. 515–525). In addition, Doctor Snape's opinion was that the type of cirrhosis from which the plaintiff was suffering was clearly of a chronic rather than an acute nature.

 As trier of fact, I accept Doctor Snape's conclusion; accordingly, I hold that there was no causal relation between the plaintiff's cirrhosis of the liver and his ingestion of contaminated tomato juice.

 Since the plaintiff is nonetheless entitled to compensation for his injuries and losses sustained from the acute episode of food poisoning, essentially for medical expenses, loss of wages and pain and suffering, it is hereby ordered that judgment be entered in favor of the plaintiff, and that damages be awarded the plaintiff against the named defendants, in the aggregate of Five Thousand Dollars ($5,000).

In accordance with Rule 52(a), we enter the following:

## FINDINGS OF FACT.

AFFIRMED:

Plaintiff Nos. 1, 2, 3, 5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 24, 25, 29, 30, 31.

REFUSED AS STATED:

Plaintiff Nos. 4, 17, 18, 27, 28, 34, 35.

Defendant No. 4.

DENIED:

Plaintiff Nos. 8, 9, 26, 32, 33.

Defendant Nos. 1, 2, 3.

Plaintiff's No. 4 is affirmed, as a conclusion of law.

## CONCLUSIONS OF LAW.

AFFIRMED:

Plaintiff Nos. 1, 4, 7, 8 deleting the word "filth"; 9.

DENIED:

Plaintiff Nos. 6, 10, 11.

Defendant Nos. 1, 2, 3.

Plaintiff's Nos. 2, 3 and 5 are affirmed as Findings of Fact.

In any instance where there may be a lack of clarity in the approved requests, the language of the Opinion will govern.